**SEALED**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER (304) 539-0233, WITH NO LISTED SUBSCRIBER | Case No. _2:21-mj-00132___ <br><br> **Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, John A. Reese, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number (304) 539-0233 (SUBJECT TELEPHONE), with no listed subscriber, which is utilized by an as yet unidentified male subject (UM), whose service provider is VERIZON WIRELESS, a wireless telephone service provider, headquartered at 9700 112th Avenue, Northwest, Miami, Florida, 33178. The SUBJECT TELEPHONE is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2. I am a Special Agent employed by the United States Department of Justice, the Federal Bureau of Investigation (hereinafter "FBI"), and as such I am a "federal law enforcement officer" within the meaning of Fed. R. Crim. P. 41(a)(2)(C) and

authorized to apply for federal search warrants. I have been employed as a Special Agent of the FBI since August 2014. I am currently assigned to the FBI Charleston Resident Agency, Charleston, West Virginia. I have received specialized training while attending the FBI Training Academy in Quantico, Virginia, concerning violations of the Controlled Substances Act within Title 21 of the United States Code. During my employment with FBI, I have been working daily as a Special Agent and have been involved in several long-term investigations, including drug trafficking, public corruption, bank robbery, and criminal use of computers and the internet. As part of my duties with the FBI, I investigate violations of federal law, including drug trafficking offenses enumerated in Title 21 U.S.C. §§ 841, 843, and 846, and I have been the affiant on search warrants, pen register trap and trace order applications (PRTTs), have personally participated in over 100 arrests and search warrants, and have been an Affiant on numerous federal Title III affidavits. Prior to working for the FBI, I was employed as a police officer with the City of Jackson, Tennessee for five years. During my time as a police officer I had experience in dealing with drug violations, and various violent crimes.

3. During my tenure with the FBI, I have participated in numerous drug investigations during the course of which I have

(a) conducted physical and wire surveillance; (b) executed search warrants at locations where drugs, drug proceeds, and records of drugs have been found; (c) reviewed and analyzed numerous recorded conversations and records of drug traffickers; (d) debriefed cooperating drug traffickers; (e) monitored wiretapped conversations of drug traffickers and reviewed line sheets prepared by wiretap monitors; and (f) conducted surveillance of individuals engaged in drug trafficking. Through my training, education and experience, I have become familiar with (a) the manner in which illegal drugs are imported and distributed; (b) the method of payment for such drugs; and (c) the efforts of persons involved in such activity to avoid detection by law enforcement.

4. I am an investigative or law enforcement officer within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations and to make arrests for offenses enumerated in 18 U.S.C. § 2516. Among other duties, I am participating in an investigation relating to the distribution of controlled substances by RAMON DAVID ALSTON (ALSTON), TREYDAN LEON BURKS (BURKS), BRIAN DANGELO TERRY (TERRY), JASON OXLEY (OXLEY), JAMES LAWSON (LAWSON), UM, and other persons known; and others as yet unknown, in violation of 21 U.S.C. §§ 841(a)(1), 843(b), and

846, that is, distribution of controlled substances; use of a communication facility to facilitate drug trafficking; and conspiracy to distribute controlled substances.

5. On June 23, 2021, United States District Judge Irene C. Berger authorized the continued interception of wire and electronic communications over (424) 302-7534, a telephone used by TREYDAN BURKS (TARGET TELEPHONE #3), and the continued interception of wire and electronic communications over (310) 435-5289, a telephone used by BRIAN TERRY (TARGET TELEPHONE #4), the initial interception of wire communications over (681) 341-7522, a telephone used by TREYDAN BURKS (TARGET TELEPHONE #5), and the initial interception of wire communications over (678) 749-4659, a telephone used by RAMON ALSTON (TARGET TELEPHONE #6). Pertinent calls have been intercepted over these phones, establishing that UM and ALSTON are involved in the distribution of controlled substances in and around Kanawha County, West Virginia and within the Southern District of West Virginia.

## PROBABLE CAUSE

6. On 07/09/2021, at approximately 3:55 PM (session 485), UM, using the SUBJECT TELEPHONE, contacted ALSTON on TARGET TELEPHONE #6. The following was discussed:

ALSTON: Hello.

UM: Hey.

4

ALSTON: What up bro?

UM: Oh, I just bought two, two pounds at the gas station UI What's his name uh, Brisco (UI).

ALSTON: Off who?

UM: Huh?

ALSTON: Brisco's dad?

UM: His uncle UI.

ALSTON: Oh, JD, JD.

UM: JD yeah. So look. This all I need, bro. Tell sis bro 'cause we gettin on the road now.

ALSTON: Yeah, she dry, ain't nothin'.

UM: It's over?

ALSTON: Yeah, she said she gonna call me if she find somethin' though ASAP.

UM: Hey look look look. Just tell her if she can find me like a little half a piece, you feel me?

ALSTON: I got it.

UM: I went through uh I went to my wife's like cousin and shit in uh, in Miami and her Dominican boyfriend and shit. They showed me the Facetime and TONY oh my god it's the real TONY, TONY and like already told him to turn ticket but I'm a couple bands short. if I can get that halfy and

5

make up real quick, then I can go ahead. You know what I'm sayin' I need that.

ALSTON: Yeah, I'm trying I called her earlier.

UM: I know you are. I know you are.

ALSTON: Yeah, I called her she was like they wasn't playin. She was like uh when they said three months. I remembered when she told me that I was like ain't no way. I said damn, really.

UM: Ain't no way, yo.

ALSTON: That shit crazy. Fucked up.

UM: Right.

ALSTON: Fucked up.

UM: Yeah UI shit. I'm gonna be in NC for like three days. I'm gonna call you every single day, bro.

ALSTON: Yeah bro as soon as she calls me, I'll be like come on 'cause I mean, sit.

UM: Because like that's all he want, you know what I'm sayin'? And look UI I'm like the real me you know what I'm sayin'? But I haven't had the opportunity.

ALSTON: Mhm exactly yeah.

UM: Right.

ALSTON: Alright so I'm gonna call her back and see what she say.

6

UM: Ok ok.

ALSTON: Alright.

7. Based on my training, experience, and the facts of the investigation UM told ALSTON he had just purchased two pounds of controlled substances at a gas station, ("Oh I just bought two, two pounds at the gas station UI What's his name uh, Brisco (UI)"). UM then told ALSTON that he still needed ALSTON to contact his supplier to get more controlled substances, ("JD yeah. So look. This all I need, bro. Tell sis bro 'cause we gettin on the road now."). ALSTON said the supplier did not have any controlled substances available to sell, ("Yeah, she dry, ain't nothin'"). UM asked if ALSTON's supplier was no longer in business ("It's over?"). ALSTON replied that the supplier was trying to get more controlled substances and would contact him once she found more to sell, ("Yeah she said she gonna call me if she find somethin' though ASAP"). UM then said he was looking for a half-pound, ("Hey look look look. Just tell her if she can find me like a little half a piece, you feel me?"). ALSTON said he understood but believed the supplier would not have any available controlled substances for three months, ("Yeah, I called her she was like they wasn't playin. She was like uh when they said three months. I remembered when she told me that I was like ain't no way. I said damn, really").

7

8. On July 12, 2021, at approximately 12:32 PM (Session 00578), ALSTON on TARGET TELEPHONE #6, received an incoming call from UM, on the SUBJECT TELEPHONE. The following was discussed:

UM: Yo.

ALSTON: Hey you still, you in West V or NC?

UM: NC.

ALSTON: Oh, Okay, Okay, Okay.

ALSTON: Damn, I needed you to go by Black Daves for me man. When you going back to West V?

UM: Uhhh, probably tomorrow.

ALSTON: Yeah this uh, ah, guess what bruh, guess what I got ahold of yesterday?

UM: Who?

ALSTON: Tico, nigga. Remember him?

UM: Mhm.

ALSTON: Yep, he said he got everything. He said he got the purest Tony. Pure, uh, good smoke. And, he got the other thing we fuck with. I told him, he gonna come over today and holla at me face to face. Imma tell him what you said, that you need the easy. But, we ain't even gonna fuck with that girl no more, we got Tico back, bro.

UM: Alright.

8

ALSTON: That nigga was so happy to hear from me, he was like "Whats up bro?". He's like, "I got fake money and everything, bro". He's like, "Man that shit look real as fuck".

UM: Oh shit.

ALSTON: Yeah, he sent me pictures. That shit do look real though.

UM: Mhm. <laughs>

ALSTON: You know Tico. You, you remember Tico, nigga.

UM: Mhm

ALSTON: Tico didn't like (UI-Tub?). That's why I'm sayin, Tico was like, remember I told you? He was like, "Man, I don't like that dude, Guch. He was like, that you brought. He was like, "That nigga was tryin' to ask me, like, ask me my number and shit bro, he was tryin' to do some backstab shit to ya bro. He was like, "Don't fuck with that nigga." Remember? I told you that.

UM: Mhm.

ALSTON: He tried uh, he tried to wait until I went in the house, cuz I went in the crib with Pablo. [UI] was out there Was like, uh why don't you give me a number? Tico was like, "No, I can't do that, bro."

UM: Goddamn.

9

ALSTON: Yeah, he tried to do a baby jacker?

UM: Mhm.

ALSTON: Yep, but uh Black Dave tryin uh, Black Dave tryin to keep that car forever. But I just wanted you to go over there and put the fear of God in him.

UM: &lt;laughs&gt; Yep, I told him, soon as I tough down I'll be over there.

ALSTON: Alright, cool.

UM: (UI) huh?

ALSTON: Huh?

UM: Where's Sauces little ass at?

ALSTON: That's what I'ms sayin'. Sauce don't got that same. When you pull up and you go over there and be like, "Man, what you gonna do with my uncle's car bro?" You gonna either finish it or give it back bro, like what, what, what are you doin? Cuz (UI) can't do it and I ain't there. So, that's why I was like, yep I know who to call and he was like, "Yeah, call (UI)".

UM: Alright, well yep well tell him shit, soon as I touch down. I might be, I might be there tonight.

ALSTON: Alright, but like I said, if you come this weekend, well I'm gonna talk to Tico. Whenever you come, period, it's good. He said everything Gucci.

UM: Alright, that's whats up.

ALSTON: He said its 100. He was like it's was what you said bro. It was like, man this shit is brown bro, what is she talkin 'bout?

UM: Yeah

ALSTON: Yeah, fuck that. We bout to be back rollin', bro.

UM: Ok, alright that's what's up.

ALSTON: Alright.

UM: Ok.

9. Based on my training, experience, and the investigation thus far, ALSTON notified UM that he reestablished contact with a drug supplier ("Yeah this uh, ah, guess what bruh, guess what I got ahold of yesterday?"). UM responded by asking who ("Who?"). ALSTON told UM it's TICO and asked if he remembered him ("Tico, nigga. Remember him?"). ALSTON told UM that TICO is a supplier of all controlled substances, that ALSTON had a meeting later this day with TICO, and that ALSTON and UM would no longer need to deal with the other supplier ("Yep, he said he got everything. He said he got the purest Tony. Pure, uh, good smoke. And, he got the other thing we fuck with. I told him, he gonna come over today and holla at me face to face. Imma tell him what you said, that you need the easy.

11

But, we ain't even gonna fuck with that girl no more, we got Tico back, bro").

10. In my training and experience, I have learned that VERIZON WIRELESS is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including E-911 Phase II data, also known as GPS data or latitude-longitude data and cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device.

12

Accordingly, cell-site data is typically less precise that E-911 Phase II data.

11. Based on my training and experience, I know that VERIZON WIRELESS can collect E-911 Phase II data about the location of the SUBJECT TELEPHONE, including by initiating a signal to determine the location of the SUBJECT TELEPHONE on VERIZON WIRELESS's network or with such other reference points as may be reasonably available.

12. Based on my training and experience, I know that VERIZON WIRELESS can collect cell-site data about the SUBJECT TELEPHONE. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as VERIZON WIRELESS typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

13. Based on my training and experience, and the investigation thus far, the above-stated information establishes probable cause that UM is engaged in the distribution of controlled substances (likely methamphetamine and/or heroin), and that he uses the SUBJECT TELEPHONE to facilitate his drug trafficking activities. Further, the location information for the SUBJECT TELEPHONE sought by this warrant will constitute relevant evidence of UM's criminal activity by identifying locations where UM lives and travels such that agents will be able to identify places where UM stores drugs, obtains drugs, and meets with suppliers and customers.

### AUTHORIZATION REQUEST

14. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c), authorizing the collection of geolocation information for the SUBJECT TELEPHONE for 45 days.

15. I further request that the Court direct VERIZON WIRELESS to disclose to the government any information described in Attachment B that is within the possession, custody, or control of VERIZON WIRELESS. I also request that the Court direct VERIZON WIRELESS to furnish the government all information, facilities, and technical assistance necessary to

14

accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with VERIZON WIRELESS 's services, including by initiating a signal to determine the location of the SUBJECT TELEPHONE on VERIZON WIRELESS's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate VERIZON WIRELESS for reasonable expenses incurred in furnishing such facilities or assistance.

16. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the SUBJECT TELEPHONE outside of daytime hours.

## SEALING

17. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

## DELAYED NOTIFICATION

18. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 90 days after the collection authorized by the warrant has been completed (i.e. approximately November 26, 2021). This investigation is ongoing and involves multiple targets of investigation, multiple states and federal districts, and complex investigative techniques. There is reasonable cause to believe that providing immediate notification of the warrant is likely to have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the SUBJECT TELEPHONE would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. See 18 U.S.C. § 3103a(b)(1).

19. As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. See 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or

16

electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

<div style="text-align: right;">

Respectfully submitted,

JOHN A. REESE
Special Agent
FEDERAL BUREAU OF INVESTIGATION

</div>

Subscribed and sworn to before me by telephonic or other reliable means pursuant to Fed. R. Crim. P. 4.1 on July <u>15</u>, 2021.

Omar J. Aboulhosn
United States Magistrate Judge

## **ATTACHMENT A**

### **Property to Be Searched**

1. The SUBJECT TELEPHONE, a cellular telephone assigned call number (304)539-0233, no subscriber information, whose service provider is Verizon Wireless.

2. Records and information associated with the SUBJECT TELEPHONE that is within the possession, custody, or control of Verizon Wireless.

## **ATTACHMENT B**

### Particular Things to be Seized

**I.    Information to be Disclosed by the Provider**

All information about the location of the SUBJECT TELEPHONE described in Attachment A for a period of 45 days, during all times of day and night. "Information about the location of the SUBJECT TELEPHONE" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of Verizon Wireless, Verizon Wireless is required to disclose the Location Information to the government. In addition, Verizon Wireless must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with Verizon Wireless services, including by initiating a signal to determine the location of the SUBJECT TELEPHONE on Verizon Wireless' network or with such other reference points as may be reasonably available,

and at such intervals and times directed by the government. The government shall compensate Verizon Wireless for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. See 18 U.S.C. § 3103a(b)(2).

### II. Information to Be Seized by the Government

All information described above in Section I that constitutes evidence of violations of Title 21 U.S.C. §§ 841, 843(b), and 846 involving the user of the SUBJECT TELEPHONE.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.